UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | 2:19-cr-20288 |
| Plaintiff, | |
| | HON. TERRENCE G. BERG |
| v. | |
| **ERRON SANDERS**, | **ORDER DENYING MOTION FOR RECONSIDERATION** |
| Defendant. | |

This matter is before the Court on the government's motion seeking reconsideration of the Court's April 17, 2020 order releasing Erron Sanders to home confinement until sentencing.

Sanders has been in custody since he made his initial appearance in federal court more than a year ago, on April 30, 2019. ECF No. 7 (Consent Order of Det.). At first, Sanders consented to federal detention because he was in state custody on a parole violation at the time of his appearance. ECF No. 18, PageID.47 (Mot. for Pretrial Release). Later he filed a motion seeking to be released on conditions, but at the hearing asked to defer any decision on that motion while he gathered relevant medical records in support of his motion. *Id. See* Oct. 18, 2019 Dkt. Entry. Sanders eventually pleaded guilty. After the COVID-19 pandemic arose, he renewed his motion for release. ECF No. 29 (R. 11 Plea Agr.). The Court granted Sanders's motion provisionally, pending a hearing on any

1

motion to reconsider. ECF No. 35 (Apr. 17, 2020 Order). Until that hearing, no judicial officer had conducted a full detention hearing or made any determination as to whether there were conditions that would overcome any risk that Sanders might flee or present a danger to the community. At the evidentiary hearing, which took place on April 30, 2020, the Court received testimony from two witnesses as well as additional briefing and exhibits in support of the parties' respective positions.

Under the relevant provision of the Bail Reform Act, 18 U.S.C. § 3143(a), which governs release or detention pending sentencing, "the judicial officer shall order that a person who has been found guilty of an offense and who is awaiting imposition or execution of a sentence . . . be detained, unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community if released" under conditions as allowed under § 3142(b) and (c).

While the question of bond in this case is admittedly a close one, having weighed all of the available evidence presented by the parties, the Court finds that there is clear and convincing evidence that, if released under strict conditions of home confinement and close supervision, Sanders is unlikely to flee or pose a danger to the community. Flight has never been a salient issue in this case, as Sanders has no resources and no record of interstate or international travel. Although he has used

numerous alias names in the past, and has a history of violating parole conditions, no proof has been admitted showing a likelihood of flight. Evidence relating to danger to the community consists primarily of the concern that because Sanders has committed crimes in the past, including when on parole, it is likely he will commit crimes again if released. There is considerable appeal to this argument.

But there are also three countervailing factors that allow Sanders to demonstrate by clear and convincing evidence that he will not pose a danger if released on home confinement. First, the ongoing COVID-19 pandemic creates strong disincentives for both flight and criminal activity by discouraging person-to-person contact and travel, especially for individuals who, like Sanders, suffer from poor health and advanced age. Second, Sanders's criminal history is predominantly non-violent, and there is no evidence of any tendency on his part to use physical force against others. This mitigates the Court's concern about the level of danger he may pose to the public. Third, requiring Sanders to remain in strict home confinement in the custody of his fiancée, a responsible third-party custodian, in an area far removed from the neighborhood where he has previously engaged in drug trafficking, will adequately protect the community during the limited time between now and sentencing. The motion for reconsideration, ECF No. 37, will therefore be denied. Sanders will be released to home confinement in the custody of his fiancée and

3

third-party custodian, Theresa Holloway, until the date set by this Court for his sentencing.

## BACKGROUND

The factual and procedural background of this case is set forth in detail in the Court's April 17, 2020 Order. ECF No. 35. Briefly, Sanders has pled guilty to the offense of felon in possession of a firearm, 18 U.S.C. § 922(g)(1). He is currently awaiting sentencing. As mentioned above, there has not previously been any judicial assessment of flight risk or dangerousness in this case because Sanders originally consented to detention. ECF No. 7. At the April 30, 2020 hearing on this matter, the parties presented evidence and argument about potential risk factors for flight and continued criminal activity.

The Court heard testimony by Special Agent Nicholas Mascorro, of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") establishing that ATF agents conducted controlled purchases of heroin and oxycodone from Sanders in early 2019, in the months leading up to the execution of a search warrant at his home. Agents also discovered a firearm and significant amounts of cash during the course of that search. Sanders was charged with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). The government elected not to charge Sanders with any of the alleged drug-trafficking conduct that was the subject of both the hearing testimony and the affidavit in support of the search warrant.

Theresa Holloway, Sanders's former spouse and current fiancée, also testified concerning her suitability as a third-party custodian for Sanders, should he be released to home confinement. Holloway lives by herself in Grand Rapids, Michigan. Because she is currently unemployed and following Michigan Governor Gretchen Whitmer's stay-at-home order, she is at home essentially 24 hours each day. *See* GOVERNOR OF MICHIGAN, E.O. No. 2020-42 (requiring that all individuals in the state "are ordered to stay at home or at their place of residence," subject to enumerated exceptions), No. 2020-77 (amending E.O. 2020-42 to extend its duration to May 28, 2020). Holloway has a car and is willing to pick Sanders up from the Federal Detention Center in Milan, Michigan and bring him back to Grand Rapids. Through her testimony, she demonstrated that she takes seriously the responsibility inherent in serving as a third-party custodian. Holloway swore that she would monitor Sanders's conduct and report any violations of conditions of release to the Court, knowing that it could result in his incarceration.

Sanders is currently in quarantine in a special housing unit at the Milan Federal Correctional Institution in anticipation of release to home confinement. *See* ECF No. 35, PageID.206. Before being moved to quarantine, Sanders was held at the Milan Federal Detention Center. As of May 8, two detainees at Milan FDC have COVID-19. Milan Federal Correctional Institution, in contrast, has 11 open cases of COVID-19 among its prison population, with 57 inmates having recovered from the

disease. Of the 55 Milan FDC and FCI employees originally diagnosed with COVID-19, 46 have recovered and returned to work.

## DISCUSSION

Because Sanders has already been convicted of an offense and accordingly is awaiting sentencing rather than trial, his release or detention is governed by 18 U.S.C. § 3143(a). Under that provision, the judicial officer must find by "clear and convincing" evidence that Sanders is neither a flight risk nor a danger to the community. 18 U.S.C. § 3143(a)(1). Having heard and considered all the evidence, the Court finds that he has met that burden and that release is therefore warranted under § 3143(a)(1).

Before discussing the evidence, the Court notes that the government correctly pointed out that the previous order wrongly interpreted 18 U.S.C. § 3145(c), the "exceptional reasons" analysis. That section cannot be applied to Sanders because he is not appealing a mandatory order of detention required by 18 U.S.C. § 3143(a)(2) or (b)(2). Those two provisions create a presumption of detention for defendants convicted of certain serious offenses or awaiting appeal. Such defendants may appeal a mandatory detention order on the basis that they no longer pose a flight risk or danger to the community, and "exceptional reasons" justify their release. 18 U.S.C. § 3145(c). Sanders was not convicted of any offense that would make detention mandatory, nor has there been any previous finding on flight risk or dangerousness by a judicial officer

6

for him to appeal. Section 3145(c) and its "exceptional reasons" analysis is therefore inapposite. Because Sanders is detained subject to § 3143(a)(1), to be released he must show by "clear and convincing" evidence that he is not a flight risk or danger to others.

In assessing whether the § 3143(a)(1) flight risk and dangerousness considerations are satisfied, the Court considers both the restricted possibility of flight during the COVID-19 pandemic, and the need to balance the defendant's potential dangerousness against public-health risks posed by continued incarceration of defendants in crowded correctional facilities. *See United States v. Kennedy*, No. 18-20315, 2020 WL 1493481, at *3 n.3 (E.D. Mich. Mar. 27, 2020) (Levy, J.). These pandemic-specific considerations are inextricable from the four 18 U.S.C. § 3142(g) factors courts generally consider in evaluating flight risk and danger. *See United States v. Kahn*, No. 19-80169, 2020 WL 1582279, at *6 (S.D. Fla. Apr. 2, 2020) ("[T]he COVID-19 pandemic is a valid factor for this Court to consider in determining appropriate conditions of release at a bond hearing."); *United States v. Ozor*, No. GJH-19-289, 2020 WL 1694365, at *3 (D. Md. Apr. 7, 2020) (considering defendant's health and the "COVID-19 public health emergency" in determining whether he had met his burden under 18 U.S.C. § 3143(a)).

Further, the Bail Reform Act permits courts to assess a defendant's risk for flight or dangerousness against the backdrop of specific conditions of release it plans to impose. Section 3143(a) specifies that a

pre-sentencing defendant in Sanders's category will be detained unless the judicial officer finds that "the person is not likely to flee or pose a danger to the safety of any other person or the community *if released under section 3142(b) or (c)*." Section 3142(c) provides that where a court is concerned that releasing a person on personal recognizance "will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community," the court may impose conditions of release, including release to a third-party custodian. 18 U.S.C. § 3142(c)(B)(i). That custodian must be "able reasonably to assure the judicial officer that the person will appear as required and will not pose a danger" to the community. *Id.* Additionally, the third-party custodian must agree to supervise the defendant and to report any violation of a release condition to the court. *Id.* Accordingly, in assessing the four § 3142(g) factors to determine whether Sanders poses a risk of flight or danger, the Court will consider whether he would pose such a risk if released to home confinement in the custody of his fiancée.

The four § 3142(g) factors are: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g). Considering the evidence before the Court relating to these factors, clear and convincing evidence demonstrates that, if released to strict home confinement in the custody

8

of his fiancée, Sanders will pose a minimal risk of flight or danger to the community.

### A. Nature and circumstances of the offense charged.

The offense charged in this case, to which Sanders pled guilty, is felon in possession of a firearm, 18 U.S.C. § 922(g)(1). Possession of a firearm by a prohibited person is unquestionably a serious offense, particularly when the perpetrator is on parole (a fact that is discussed in greater detail below). At the same time, however, there is no evidence that the firearm was used, carried, displayed, or otherwise brandished in any dangerous manner during the commission of the offense. The charge is mere possession.

Sanders's possession of the firearm, in and of itself, does not necessarily support the conclusion that he poses a danger to others. The crime of felon in possession is a "status crime" without any victim. *United States v. Decoteau*, 932 F.2d 1205, 1207 (7th Cir. 1991). It appears that Sanders was cooperative while ATF agents searched his home, leading to the discovery of a firearm. He made a spontaneous statement claiming ownership of cash found in his bedroom and, according to the Presentence Report, has clearly demonstrated acceptance of responsibility for the offense.

Additionally, the offense of felon in possession is not a crime of violence. Part of the § 3142(g) inquiry into "the nature and circumstances of the offense charged" includes considering "whether the offense is a

crime of violence." 18 U.S.C. § 3142(g)(1). Here, the Sixth Circuit has held that felon in possession is not a crime of violence within the context of the Bail Reform Act. *United States v. Hardon*, 149 F.3d 1185 (Table), 1998 WL 320945 (6th Cir. June 4, 1998) (unpublished). *See United States v. Singleton*, 182 F.3d 7, 16 (D.C.C. 1999) (same). Being a felon in possession of a weapon does not "involve[ ] a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 3156(a)(supplying definition for "crime of violence" as used in § 3142(g)(1) and the Bail Reform Act more broadly). Ultimately, the nature and circumstances of Sanders's felon in possession crime do not indicate to the Court that he poses a risk of flight, or a danger to the community.

### B. Weight of the evidence

The "weight of the evidence" referenced in § 3142(g)(2) goes to the weight of the evidence of dangerousness and flight, not the evidence of the underlying offense. *United States v. Sykes*, No. 04-cr-80623, 2020 WL 1846946, at *2 (E.D. Mich. Apr. 13, 2020) (citing *United States v. Stone*, 608 F.3d 939, 948 (6th Cir. 2010)). As to risk of flight, the weight of the evidence is not great that Sanders is liable to flee the jurisdiction. Rather, the government's main argument is that the evidence shows a likelihood that Sanders will return to drug trafficking if he is released; in other words, that his release presents a danger to the community. But the

question is whether he would be a danger in light of conditions tailored to alleviate such risks of recidivism.

As to flight, there is little evidence that Sanders poses any risk. As defense counsel put it, Sanders "has no passport, and no money." Besides, he was born and raised in this district—in Detroit—and has lived here more or less continuously for all of his 57 years, with the exception of short stints in nearby Grand Rapids. Sanders has never lived or worked outside of Michigan. His family, community, and professional ties are in this district, with the notable exception of his former spouse, current fiancée, and proposed third-party custodian, Theresa Holloway. She resides in Grand Rapids, which is in the Western District of Michigan.

Even in ordinary times, the record before the Court contains little proof supporting Sanders's potential for flight. And the extraordinary circumstances created by the global COVID-19 pandemic have made the possibility of Sanders's flight almost a nullity. As another court flatly stated, "travel is hard now." *Matter of Extradition of Toledo Manrique*, No. 19-mj-71055-MAG-1 (TSH), 2020 WL 1307109, at *1 (N.D. Cal. Mar. 19, 2020). Michigan Governor Gretchen Whitmer's stay-at-home order remains in effect, requiring that all individuals in the state "are ordered to stay at home or at their place of residence," subject to enumerated exceptions. GOVERNOR OF MICHIGAN, E.O. Nos. 2020-42, 2020-77. Violation of that order can carry hefty fines. In a time when so many Michiganders are largely confined to their homes, intrastate and

11

interstate travel is conspicuous. And international travel—with various border closings and mandatory self-quarantine rules underwritten with stiff penalties—is even more difficult. *See Manrique*, 2020 WL 1307109, at *1. Moreover, any travel increases the possibility of being exposed to the virus. Sanders is concerned about his health—that is the driving motivation behind his motion for release; he would be unwise to incur the risk of serious illness by fleeing. The weight of the evidence demonstrates that Sanders does not pose a flight risk.

Regarding dangerousness, the evidence includes Sanders's somewhat lengthy criminal history. The Presentence Report contains a detailed and thorough summary of Sanders's entire criminal history, which the Court is taking into account in assessing the question of detention. Sanders's most significant prior offense is for a 1991 unarmed robbery, committed when Sanders was 29. He is now 57. Although the Court credits testimony from Special Agent Mascorro showing that Sanders was selling heroin and oxycodone in the months leading up to the April 2019 search of his residence, the Court also considers that this conduct did not result in criminal charges. Uncharged conduct should be accorded comparatively less weight in assessing dangerousness. The Court must also counterbalance this evidence with the fact that COVID restrictions, Sanders's health, conditions of home confinement, and separation from the Detroit neighborhood where his drug-trafficking

market existed will minimize the risk of Sanders continuing to engage in drug trafficking.

### C. History and characteristics of the person

The "history and characteristics" of a person," as defined by 18 U.S.C. § 3142(g)(3), encompass numerous qualities including the defendant's character, physical and mental condition, family ties, community ties, past conduct, history of drug or alcohol abuse, and criminal history. These considerations also include whether the person was on probation or parole at the time of the current offense. 18 U.S.C. § 3142(g)(3). Sanders's history and characteristics raise serious questions of possible dangerousness; particularly the fact that he has repeatedly violated parole conditions, and was on parole at the time of this offense.

Because the Bail Reform Act expressly incorporates a defendant's physical condition into "history and characteristics," the Court must also consider Sanders's potential vulnerability to COVID-19 in assessing flight and dangerousness. During the hearing, both parties agreed that Sanders is 57 years old and has the following medical problems: (1) enlarged prostate with lower urinary tract symptoms; (2) stage 2 chronic kidney disease; (3) prediabetes; (4) essential (primary) hypertension; (5) hyperlipidemia; (6) paranoid schizophrenia; (7) depression and anxiety; and (8) drug addiction. The parties disagree, however, on whether and to what extent any of these health problems may properly be recognized as potential COVID-19 comorbidities. Neither party presented witnesses

qualified to offer opinions based on their medical expertise, and the Court professes none of its own. But the parties did offer evidence in the form of scientific studies and summaries of medical reports. The Court cannot shrink from its responsibility to make a determination as to whether Sanders's poor health makes him more vulnerable to contracting serious complications from COVID-19 than the average detainee. Nonetheless, the Court's decision regarding detention does not turn entirely on Sander's medical diagnoses. Rather, it turns on a confluence of case-specific factors—pandemic conditions, availability of a strong third-party custodian, and the nonviolent nature of his offense, among others—that, together with his health, impact the Court's assessment of Sanders's risk for flight or dangerousness under § 3142.

This Court's previous order focused on Sanders's hypertension as the condition presenting his greatest possible vulnerability to the virus, and the Court remains most concerned about that potential comorbidity. *See* ECF No. 35, PageID.202–03. Although hypertension is not among the COVID-19 risk factors enumerated in the Centers for Disease Control and Prevention ("CDC") advisory submitted by the government, *see* ECF No. 37-4, PageID.247, a number of recent reports and studies have identified an increased risk of death from the virus for individuals with hypertension. *Reuters*, for example, has reported that "[a] disproportionate number of patients hospitalized by COVID-19, the disease caused by the virus, have high blood pressure." Deborah J.

14

Nelson, *Blood-pressure drugs are in the crosshairs of COVID-19 research*, Reuters (Apr. 23, 2020), https://www.reuters.com/article/us-health-conoravirus-blood-pressure-ins/blood-pressure-drugs-are-in-the-crosshairs-of-covid-19-research-idUSKCN2251GQ.

Moreover, a separate CDC report dated April 8, 2020 that examined COVID-19 patients in 14 states showed that 49.7 percent of those hospitalized suffered from hypertension. Shiki Garg, Lindsay Kim, et al., *Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019 – COVID-NET, 14 States, March 1–30 2020,* Morbidity and Mortality Weekly Report, Centers for Disease Control (Apr. 8, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6915e3.htm.A. And another recent study from the *Journal of American Medicine*, which examined medical records of 5,700 COVID-19 patients at 12 New York hospitals, found that, of those who died, 57 percent had hypertension. Safiya Richardson, Jamie S. Hirsch, et al., *Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized With COVID-19 in the New York City Area*, JAMA, Apr. 22, 2020. Defendant submitted this study to the Court in support of his motion for release. ECF No. 44-1. *See also* Dara K. Lee Lewis, *How does cardiovascular disease increase the risk of severe illness and death from COVID-19*, Harvard Med. School Health Blog (Apr. 2, 2020), https://www.health.harvard.edu/blog/how-does-cardiovascular-disease-increase-the-risk-of-severe-illness-and-death-from-covid-19-

2020040219401 ("Increased risk [for severe illness or death due to COVID-19] has also been seen in people with high blood pressure (hypertension) and coronary artery disease (CAD), though it is not clear why.").

From the evidence presented to the Court, it appears that medical professionals are still trying to determine with certainty the reasons why some individuals recover quickly from the virus, and others suffer long periods of hospitalization, or even death. Even the *American Journal of Hypertension* editorial submitted by the government contained evidence both for and against the position that hypertension is a significant comorbidity. ECF No. 43-2 (Ernesto L. Schiffrin, *Hypertension and COVID-19*, AM. J. HYPERTENSION, Apr. 6, 2020). While pointing out that hypertension was common among older persons, and therefore that a causal relationship between the condition and COVID-19 should not be assumed, the same article cited to other studies that explicitly cited hypertension as the most significant COVID-19 comorbidity:

> The most common comorbidities in one report were hypertension (30%), diabetes (19%), and coronary heart disease (8%). Another report showed that the most frequent comorbidities in patients with COVID-19 who developed the acute respiratory distress syndrome were hypertension (27%), diabetes (19%) and cardiovascular disease (6%).

ECF No. 43-2. It is clear that the information about potential comorbidities is continuing to develop; this Court finds no reason to

16

disregard reputable studies indicating that hypertension may be an emerging risk factor for the virus. In support of its position that hypertension does not meaningfully increase an individual's risk of contracting and becoming seriously ill from COVID-19, the government cites a portion of the Mayo Clinic website, which describes hypertension as "a common condition" that may exist "for years without any symptoms." ECF No. 37, PageID.215 (Gov't Br.) (citing ECF No. 37-2, PageID.238 (High blood pressure (hypertension), MAYO CLINIC)). Critically, that source contains no reference to the interaction between hypertension and COVID-19. Nor has the government adequately explained why this Court should not credit studies from the CDC itself, and a peer-reviewed study published in the *Journal of American Medicine*.

Although the Court is concerned about hypertension as a potential risk factor for COVID-19, it emphasizes that a diagnosis of hypertension alone—without other evidence indicating a low risk of flight or dangerousness—would be insufficient grounds to release a defendant from detention pending sentencing. Essentially, the decision to release Sanders to home confinement does not depend solely on the question of whether hypertension meaningfully increases an individual's risk of experiencing serious complications from COVID-19.

The Court must also consider Sanders's health concerns in the context of his other "history and characteristics." Here, that includes a

17

pattern of parole violations, a history of drug and alcohol problems, as well as diagnosed mental illness. Sanders was on state parole when he possessed a weapon as a felon in 2019, leading to this most recent criminal case. According to the Presentence Report, he also committed parole violations in 1987, 1998, 2007, and 2012, in addition to his most recent violation. His 2001 and 2007 parole violations involved new convictions. Sanders also has also been diagnosed with mental illness, including depression, anxiety, and paranoid schizophrenia. ECF No. 44-2 (Psych. Report). His treatment for those problems, through medication and counseling, has been sporadic at best. *See id.* He has also regularly abused alcohol, crack cocaine, and heroin as an adult. *Id.* Sanders was habitually using heroin as recently as early 2019, though defense counsel points out that he has now been sober for one year, as his current period of incarceration began in March 2019. *Id.*

Sanders's history of parole violations, substance abuse, and diagnosed mental health problems are concerning to the Court because they increase the risk that he will continue to engage in drug trafficking. Drug trafficking has served, in the past, as a way for Sanders to fund his own addiction. Substance abuse and untreated mental illness also increase the likelihood that he will make poor choices, potentially including new crimes. But Sanders has been clean for more than a year now. If his addiction remains under control it will not exacerbate the risk of him engaging in new criminal activity. Additionally, the Court will

18

fashion more detailed conditions of release—to be included in a separate order—that will assist Sanders in avoiding alcohol or drugs and provide for mental-health treatment.

Having a committed third-party custodian such has Holloway will also minimize the risk that Sanders will endanger the community by dealing drugs. Holloway gave compelling testimony that she will have zero tolerance for Sanders using her home as a base for any type of illegal activity. Defense counsel makes the additional point that it would be extremely difficult for Sanders to engage in drug-trafficking in Grand Rapids, a city where he has almost no contacts other than Holloway, while under home confinement. Finally, both Holloway and Sanders—as an engaged couple—have strong incentives to prevent Sanders from violating his conditions of release and exposing himself to an additional period of incarceration.

### D. Nature and seriousness of the danger to any person or the community that would be posed by release.

With the exception of the 1991 conviction for unarmed robbery, Sanders does not have a demonstrated history of engaging in violence against others. The Court is nonetheless concerned about his recent drug trafficking given the broader danger that substances like heroin, and the risks associated with its sale, pose to the community, as well as to Sanders himself. Again, however, the Court is satisfied that conditions of his release, including home confinement and a total prohibition on use of

drugs and alcohol, will minimize the risk that Sanders will endanger himself or the community by using or dealing drugs.

The Court has considered the parties' briefs, exhibits, and witness testimony. With the benefit of this additional information presented in the course of deciding the motion for reconsideration, the Court finds that Sanders has shown by clear and convincing evidence that conditions can be fashioned that will ensure he is not a flight risk or a danger to the community. These conditions can secure his appearance for sentencing, and the safety of the community. They will also serve to diminish the risk of Sanders contracting COVID-19, and the general public-health risk created by large prison populations. *See Kennedy*, 2020 WL 1493481, at *2 (explaining why detention conditions "create a heightened risk of danger to detainees" during the pandemic); *Basank v. Decker*, No. 20 Civ. 2518 (AT), 2020 WL 1481503, at *6 (S.D.N.Y. Mar. 26, 2020) (holding that "public health safety are best served by rapidly decreasing the number of individuals detained in confined, unsafe conditions."); *United States v. Garlock*, No. 18-CR-00418-VC-1, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) (collecting cases discussing the risk that inmates, guards, and the community at large create by having large prison populations during a pandemic).

There was one more fact proffered by the government as a reason supporting detention, the relevance of which the Court strains to understand. The government brought up the murder of Roosevelt Knight,

a federal detainee recently released because his bronchial asthma made him particularly vulnerable to COVID-19. Knight became a victim of homicide on the streets shortly after his release. *See United States v. Knight*, No. 18-cr-20180-001, 2020 WL 1558152 (E.D. Mich. Mar. 24, 2020) (partially granting motion to revoke order of detention), 2020 WL 1551303 (denying government's motion for reconsideration). Sadly, the Court of course must acknowledge the prevalence of violent crime in our city, including in areas to which individuals arrested for federal crimes may sometimes be released on bond. But this admittedly sometimes-deadly environment is part of the daily tragic reality for many people living in underserved and impoverished neighborhoods in metro Detroit (and other urban areas around the country that are generally ignored by federal policy). That reality should never be exploited, nor can it be accepted, as a reason for locking people up. Nor should the risk of such dangers be confused with the legitimate justifications for detention—that the defendant presents a danger to *others* or is a risk of flight. Perhaps this point was raised to counterbalance Sanders's position that detention presents a risk to his health. Well, the response may be, so does release— he may get killed out there. If that is the government's argument, it is specious and well off the mark. The health risks posed by the close quarters of confinement during a highly contagious respiratory pandemic, when combined with a particular inmate's vulnerability to consequences of the disease, are circumstances that the Court and the

21

government can control. They also fall squarely within one of the Bail Reform Act's enumerated factors informing the decision whether to release or detain an individual. Among the factors to be considered under 18 U.S.C. § 3142(g)(3)(A) is "the person's . . . physical condition." Except for the rare circumstances when a credible threat to a witness or defendant may require some form of protective custody, the Court will not countenance the cynical and illogical position that a defendant is "safer in prison" as a reason to support detention. Such a reason is found nowhere in the Bail Reform Act and would lead to absurd and frightening consequences if it were.

The Court is aware that some courts have released defendants pending sentencing under 18 U.S.C. § 3142(i), which allows for temporary release where there are "compelling reasons." Section 3142(i), which sets out the required contents of a pre-trial detention order, provides that "The judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." The prevailing view is that § 3142(i) and its "compelling reason" analysis apply only to defendants who seek release pending trial (rather than sentencing). *United States v. Roscoe*, No. 19-cr-20537, 2020 WL 1921661, at *4 (E.D. Mich. Apr. 21, 2020) (Drain, J.) (collecting cases). Indeed, this subsection is part of

§ 3142, which governs "release or detention of a defendant pending trial," while § 3143 governs "release or detention of a defendant pending sentencing or appeal."

At the same time, one court in this district and several in other districts have held that § 3142(i) applies "even though [the defendant] has pled guilty and is thus pending sentencing rather than trial," *Kennedy*, 2020 WL 1493481, at *3, and that § 3142(i) constitutes a "separate statutory ground" for post-conviction release. *See, e.g., United States v. Stephens*, 15-cr-95 (AJN), 2020 WL 1295155, at *2–3 (S.D.N.Y. Mar. 19, 2020); *United States v. Miller*, No. 3:19-cr-00048-AA, 2020 WL 1976817 (D. Or. Apr. 24, 2020) (applying § 3142(i) to pre-sentencing defendant to assess whether a "compelling reason" justified his temporary release to home confinement). But the Court does not rely on the "compelling reason" clause of § 3142(i) in this case. By its own terms, that provision appears to address situations where there is a need to release a defendant temporarily, for a short-term purpose such as to prepare for trial or for some other compelling reason such as a funeral or medical treatment. The statute further suggests that a defendant released for a "compelling reason" would remain in the custody of a U.S. Marshal or other appropriate person (the term is undefined but the context suggests a law enforcement officer). That is not necessarily the same as being released on bond.

23

## CONCLUSION

For these reasons, the motion for reconsideration, ECF No. 37, is **DENIED**. Sanders will be released to home confinement, in the custody of third-party custodian Theresa Holloway, as soon as he completes his 14-day quarantine. A separate order will issue describing the conditions of home confinement.

Dated: May 11, 2020        s/Terrence G. Berg
                           TERRENCE G. BERG
                           UNITED STATES DISTRICT JUDGE